# ¡WEEKS *v.* DALE.

### PATENTS; INTERFERENCE; BURDEN OF PROOF.

1. The burden of the junior applicant in an interference proceeding is added to, where, before his application was filed, a patent was granted to his adversary.

2. In an interference proceeding involving the invention of an improvement in wireless cluster-sockets used as parts of electrical fixtures, where it appeared that the junior party was the inventor and manufacturer of patented clusters, and sold them to a company manufacturing and selling electrical fixtures, of which the senior party was president, under an agreement to supply the company with his devices and improvements thereon; that competition with a later inventor caused diminution in the sales of such devices, and suggested the importance of improvements; that the senior party admitted that before his alleged conception and disclosure the junior party had shown him a device similar to the construction of the issue, but without its "interior construction," and said that if he had shown him a device of precisely such construction he would have told him it was not practicable,—it was *held* that the junior party was entitled to an award of priority of invention.

No. 453. Patent Appeals. Submitted January 23, 1908. Decided March 3, 1908.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case.        *Reversed.*

The facts are stated in the opinion.

*Mr. Melville Church* for the appellant.

*Mr. W. M. Stockbridge* and *Mr. Alfred W. Proctor* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

This is an appeal from a decision of the Commissioner of Patents awarding priority to John H. Dale of the invention of a cluster-socket, in an interference proceeding having the following issue:

"1. In a cluster-socket, the combination of a finishing cap and a block of insulating material located centrally therein, and having lamp-contacts attached thereto for a plurality of lamps, said block being supported wholly by said cap, and a suitable support with which said cap is removably connected.

"2. A cluster-socket, comprising a finishing-cap, means for attaching it to a support, a block of insulating material located centrally inside of the cap, lamp-socket terminals attached to the block, and means for supporting and suspending the block upon or from the cap, whereby it is removable with the cap from the support."

"6. A cluster-socket, comprising a finishing-cap having a plurality of openings therein, a metallic disk closing the top of said cap, and removably connected therewith, and having means for attachment to a support, a block of insulating material wholly within the cap, and mounted independent of said disk and electric terminals carried by the insulating-block and presented at the respective openings in the cap.

"7. A cluster-socket comprising a dome-shaped finishing cap having a plurality of openings therein, a support-plate adapted to cover the concave side of said cap and removably connected therewith, a block of insulating material inside of said cap, circuit-terminals attached to said block, and binding-screws for conductors connected with said terminals and located on that face of the block adjacent to said support-plate, whereby the removal of the cap from the support-plate will expose the binding-screws."

The issue of the declaration contained three other counts, numbered respectively, 3, 4, and 5; but as to them the interference was dissolved

· The invention in controversy is an electrical fixture known as a "cluster-socket," which is a single structure adapted to support a plurality of incandescent lamps, and to convey current commonly to all of them. This cluster is of the type known as the wireless cluster, being so constructed that no electric wires are used except the two circuit wires. The wireless cluster comprises a block of insulating material to which are attached two master plates or pieces having attached to or formed upon them the lamp-holding and contact devices, so that when current is delivered to the two plates from the two main wires it will be distributed to all the lamps  The structure also comprises an external facing or finishing cap having orifices through which the lamps are thrust to engage the contact devices, and a base which is secured to the ceiling, and to which the finishing cap is secured.

In the invention of the issue, the block of insulating material, the contact plates, and the lamp-holding devices are all supported upon the finishing cap, so that by disconnecting the cap and the base plate, having the latter attached to the ceiling, the entire mechanism is exposed.

· Dale filed his application February 18, 1904, and the same ripened into a patent on April 19, 1904. Nelson Weeks's application was filed May 17, 1904.

· Weeks was an inventor and manufacturer of clusters covered by two patents that had been issued to him, the first on March 28, 1898. Dale was the president of the Dale Company, which was engaged in the manufacture and sale of electrical fixtures. Weeks sold the product of his manufacture to the Dale Company, and entered into an agreement with it, which was renewed January 4, 1902. The last agreement is the only one in evidence, but was shown to be a substantial renewal of the former one. Weeks bound himself to sell the devices covered by his patents to the Dale Company, and not to supply the same to any person or persons in the United States for any reason whatever. This included also any improvements in rearrangement of or additions to the said device which Weeks may invent or receive a patent for. The Dale Company agreed to push the sale of the device, to introduce it, so far as it lay in its power, through-

out the United States, to advertise it, and to order it from Weeks in lots of not less than 1,000. It also covenanted not to make or sell, or procure to be made and sold, any other multiple or socket clusters than those furnished by Weeks. In case of any breach of the covenants, Weeks was authorized to terminate the agreement upon thirty days' written notice. In such event Weeks was to fill all pending orders, and the Dale Company was to have the right to sell the balance of stock, subject to the agreed payments to Weeks.

Considerable sales were made under these agreements. Competition with the product of another and later inventor in the same field, apparently, caused a diminution of sales, and suggested the importance of an improvement in the old device. Weeks's preliminary statement claims conception of the invention of the issue in July, 1899, and reduction to practice in July or August, 1899. Dale, who is the president of the Dale Company, claimed conception in January, 1903, disclosure and drawings in the same month, and reduction to practice in November, 1903. Dale took no testimony in support of his said dates, but relied on his application as filed. Weeks has not only the ordinary burden imposed upon the junior party in all cases, but also the additional burden created by the patent issued to Dale before his later application was filed.

Weeks attempted to show that he had conceived the invention in 1899, constructed a model, and disclosed it to Dale. All the tribunals of the Office concurred in the conclusion that his evidence was insufficient to prove disclosure of this device to Dale. Weeks also introduced evidence tending to show the construction of a device embodying the invention of the issue, which he exhibited, that it had been reduced to practice, and that he had shown and explained it to Dale in August, 1902. The testimony is clear that he made the device in 1902, and all of the tribunals below concurred in holding that it had been constructed about the time claimed. No practical test was made to show that it was capable of being used successfully, prior to the taking of the testimony in the case. It appeared then to work successfully.

The Examiner of Interferences held that the device as constructed was nothing more than a model, and required an actual test to demonstrate its capacity and show reduction to practice. He also held the testimony insufficient to show, with the requisite certainty, that Weeks had shown and explained this model to Dale. The Examiners-in-Chief, on appeal, held that, whether called a model or not, the Weeks construction of 1902 was a full-sized device, obviously capable of conducting currents of electricity to and from standard electric lights screwed into its socket, and therefore a reduction of the invention to practice. They were satisfied, also, that he had shown and explained the device to Dale in August, 1902. Consequently they reversed the decision of the Examiner of Interferences, and awarded priority to Weeks. The Commissioner, who concurred in the views of the Examiner of Interferences, reversed their decision and awarded priority to Dale.

In the view that we have taken of the evidence relating to the communication of the invention to Dale in August, 1902, it is unnecessary to consider the question of invention in 1899, and communication thereof to Dale, or that of reduction to practice through the construction of the full-sized device or model of 1902.

Dale, as we have seen, gave no testimony relating to his conception and construction, relying on his application therefor. Weeks testified positively that he had shown and explained the construction of 1902 to Dale in August of that year. He had no reason, at that time, for concealing the device from Dale, and there were strong reasons why he should have shown it to him as soon as completed. Weeks was needy, and was still in contractual relations with Dale, who had the exclusive right to market his inventions. Both were directly interested in their success. Dale testified that the sales of the old cluster had fallen off by reason of competition in the market with a new cluster, that had been put upon the market by another. Dale was called as a witness on his own behalf to contradict the testimony of Weeks on this point. After some preliminary evidence, in which he said that Weeks had endeavored to lead him

to believe that he was striving to improve upon the cluster they were selling, but had never produced a cluster, or drawing of one, that would enlighten him as to its construction, he was shown the Weeks' 1902 construction, and asked if he had ever seen one like it, and, if so, under what circumstances: His reply was: "The sample just handed me is similar to the one shown me by Weeks, without the interior construction. I am not sure it is the same in all details, but its general appearance is the same." He was then told by his counsel that Weeks had testified that he had shown him this sample in August, 1902, and that he (Dale) had given it general approval, and asked how soon he could have the same ready to place on the market; and asked: "What is your comment upon this testimony of Mr. Weeks?" He answered: "Mr. Weeks never showed me that cluster in the form it is in at the present time; and if he had I should have told him that such a device was not practicable." He further said: "I told Mr. Weeks that I was pleased to note he was working along lines that would overcome the necessity of using a porcelain base, and that I hoped that he would make all haste to produce a finished article, which I assured him that I would heartily welcome in order to meet the Benjamin Company competition."

Other testimony on behalf of Weeks showed, beyond a doubt, that he had conceived the invention on or before April 7, 1902, and during the summer of that year had constructed the device produced in evidence. He made a sketch illustrating his conception, and left it with Howson & Howson, patent attorneys of New York, after explaining it fully. This sketch bore the file mark of the office, dated April 7, 1902. Some five or six months thereafter, he took the completed device to the same office, where it remained until delivered to Weeks's counsel in this case for use therein. This device corresponded with the sketch and Weeks's explanation of the same. His object was to have an application made for a patent; but as he was in debt to Howson & Howson for services rendered in a former interference case, nothing was done by them. Other testimony tended to show that Weeks was poor and in want of money at-

that time and afterwards. Dale admitted, as we have seen, that Weeks appreciated the importance of making an improvement upon his old cluster, and had told him he was striving to accomplish it; and that the device shown to him by Weeks in August, 1902, was similar in general appearances to the exhibit. He said, however, that it was without the internal construction.

Considering the contractual relations between the parties at the time, and their mutual interests, it is incredible that Weeks, who had the completed device at the time, would have made a different one to show to Dale, or would have changed the interior construction of the old one in order to deceive Dale, who was an expert manufacturer of such articles. He could have had no motive for such action. It is incredible, also, that Dale could have had the device shown to him without examining the interior construction, which contained the essential feature of the invention, and examining it to ascertain if it was indeed an improvement upon the old one in any respect. It is significant, also, that Dale did not attempt to describe the interior construction of the device that he saw, notwithstanding he undertook to support his denial of its approval by him, as testified by Weeks by saying that if Weeks had shown the device to him "in the form it is in at the present time" he would have told him that such a device was not practicable. Why he would have told him it was not practicable he did not attempt to explain.

We think the evidence, direct and circumstantial, is sufficient to show that Weeks conceived the invention of the issue, and communicated it to Dale, who cannot, therefore, be held to be the inventor, notwithstanding he has received the patent for it.

For the reasons given, the decision awarding priority to Dale will be reversed, and this judgment certified to the Commissioner of Patents, as the law requires. It is so ordered.

*Reversed.*